UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| STACEY LANGLEY, | ) | Civil Action No.: 4:11-cv-3324-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| DOLGENCORP, LLC, d/b/a Dollar | ) | |
| General Stores; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  Plaintiff alleges gender discrimination, quid pro quo sexual harassment, sexually hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. as well as a state law breach of contract claim.[1]  Presently before the court is Defendant's Motion for Summary Judgment (Document # 31).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.    Plaintiff's Initial Employment with Dollar General

Plaintiff applied for and was hired by Dollar General in August 2007 for the position of a

---

[1]In her Response, Plaintiff fails to address Defendants arguments with respect to her gender discrimination, retaliation and breach of contract claims.  Thus, it appears she has abandoned those claims.

Sales Associate (Plaintiff referred to her position as "cashier or associate") at Store Number 4043 in Andrews, South Carolina (the Andrews store). Pl. Dep. 18; P. Dep. Ex. 1 (Ex. A to Def. Motion). The Andrews Store was staffed with a Store Manager (SM), an Assistant Manager (ASM), a Lead Sales Associate (LSA) (sometimes referred to as "Third Key") and Sales Associates. Darrigo Dep. 4-5 (Ex. B to Def. Motion). The SM, ASM and LSA all have keys to the store and have responsibility for opening or closing the store. The SM and the ASM (in the absence and at the direction of the SM) also have access to the store's payroll system for purposes of making manual edits to employees' time records (clock-ins, clock-outs), where necessary and appropriate, and to finalize and submit payroll for the store at the end of each workweek. Darrigo Dep. 19-20.

Plaintiff was promoted to ASM of the Andrews Store in 2008, reporting to Store Manager, Betty Dent. Pl. Dep. 19-20; Pl. Aff. ¶ 1 (Ex. 1 to Pl. Response). At the direction and delegation of the SM, the ASM, among other things, supervises store employees as well as assists with the receiving of inventory, stocking merchandise and various other responsibilities. Pl. Dep. 22.  Dent's employment with Dollar General ended in February 2010. Pl. Dep. 32-33. Plaintiff believes Dent's employment ended because she falsified time records to inaccurately reflect hours that employees had worked.  Pl. Dep. 37-38.  Falsifying time records is specifically prohibited by Dollar General's Employee Handbook and can subject an employee to immediate termination of employment. Pl. Dep. 127; P. Dep. Ex. 5 at 3. Plaintiff understood that keeping accurate time records was important to Dollar General. Pl. Dep. 61.

When Dent's employment ended, Dollar General's District Manager, Ben Bellamy, asked Plaintiff to temporarily assume some additional responsibilities and help manage the Andrews store while there was not an SM in place. Pl. Dep. 31-33, 35-36; Bellamy Dep. 17 (Ex. C to Def. Motion).

Although Plaintiff assumed some additional responsibility, she continued to be paid on an hourly basis and was responsible for accurately recording her time like all other hourly employees. Pl. Dep. 42. Bellamy told Plaintiff that if she had questions about day-to-day operations, she could contact Albert Boyd, a 14-year SM of the nearby Kingstree, South Carolina, store. Plaintiff raised no objection to Bellamy's instruction or otherwise voiced any concerns about Boyd.

### B.    Plaintiff's Prior Interactions with Boyd

Plaintiff had previously worked with Boyd at the Kingstree location for a week or two in mid-to-late 2009 to help get it ready to open. Pl. Dep. 75; Pl. Aff. ¶ 3; Boyd Dec. ¶ 4. During that time, beyond directing her activities while she was helping at the Kingstree store, Boyd did not have any supervisory authority over Plaintiff. Boyd Dec. ¶ 4. Plaintiff acknowledges that Boyd was the Kingstree SM at this time and Dent was her SM. Pl. Dep. 74-75. Plaintiff claims that while working at the Kingstree store, Boyd made sexual comments to her on three to five occasions, including "do you want to meet me in the storeroom so I can squeeze those titties," other references to her body parts and genitalia, and would make little moans when passing by. Pl. Dep. 76-77; Pl. Aff. ¶ 3. In response, Plaintiff would frown, make facial expressions, shrug it off, brush it off or ignore it. Pl. Dep. 79-80. At the time, Plaintiff did not report Boyd's conduct to anyone with Dollar General management.[2] Plaintiff was there for only about two weeks and, because she knew she was going

---

[2]Dollar General notified Plaintiff, as it did other employees, that she was an at-will employee, that it was an equal opportunity employer and that it prohibited all forms of illegal discrimination, harassment and retaliation. Pl. Dep. Exs. 1, 4, 5, 6, 7, 8. Plaintiff also received a copy of Defendant's separate, stand-alone policy titled Anti-Discrimination and Harassment Policy, reflecting Dollar General's zero tolerance for such conduct or retaliation for reporting such conduct. Pl. Dep. Ex. 4.

In addition to its Anti-Discrimination and Harassment policy, Dollar General provides mechanisms for employees to make complaints of perceived unfair treatment, including

back to the Andrews store, she "let it go."  Pl. Aff. ¶ 3. When Dent later asked Plaintiff about transferring to the Kingstree store to be Boyd's assistant, Plaintiff told her she would not go because Boyd was "fresh" and "nasty."[3]  Pl. Dep. 81. Plaintiff said nothing else about Boyd and provided no details about his alleged comments. Id.  Dent told Plaintiff "he's just like that," "that's just Albert being Albert" Pl. Aff. ¶ 4.

When District Manager, Erica Campbell[4], mentioned to Plaintiff in late 2009 about being Boyd's ASM in the Kingstree store, Plaintiff told her she was not going to be his assistant because she did not feel like being hit on every day. Pl. Dep. 86-87.  Campbell responded, "that's Albert being Albert" and "everybody knows how Albert is."  Pl. Aff. ¶ 4; Pl. Dep. 87. Plaintiff never contacted the ERC to report the comments; she thought it was sufficient to tell her manager and district manager.  Pl. Dep. 115.

---

harassment and discrimination. One such mechanism is through the Employee Response Center (ERC). In addition, Dollar General also provides a toll free number for its Alternative Dispute Resolution (ADR) department which is used to resolve employee disputes and investigate any complaints of harassment, discrimination or retaliation.  Pl. Dep. Ex. 5 at 1; Pl. Dep. Ex. 6 at 16. Plaintiff testified that she did not recall this information but does not deny receiving it and admits she never contacted the ERC or ADR for any purpose until after she was terminated. Pl. Dep. 72-73, 114, 120.

[3]In her deposition, Plaintiff explains what she means by "fresh" and "nasty":
Q:  When you say he got fresh with her, what does that mean?
A:  The word fresh, that just means saying something sexual or saying something nasty, nasty meaning if he refer to your genitals, your butt, your private part, it's just being fresh, being sexual.
Q:  Does it have–so being fresh has to be sexual?  I mean, is it something non-sexual as well?
A:  You wouldn't take it as non-sexual.
Pl. Dep. 159-60.  She also avers in her Affidavit that she told Dent that Boyd had been propositioning her for sex and making very sexual statements to her, although it is not exactly clear when she told this to Dent.  Pl. Aff. ¶ 4.

[4]Campbell was Plaintiff's District Manager until February 2010.  Bellamy Dep. 12.

Following her time in the Kingstree store, for the next five months or so, Boyd would frequently come into the Andrews Store. When he saw Plaintiff he would " walk by real quick and say, like, you ain't ready to give me that thing, or just different things to that nature.  Or always making references to my breasts" or "wanting to play with my titties, just titties." Pl. Dep. 84, 85. This happened a lot.  Pl. Dep. 84.  Plaintiff reported to Dent that Boyd was "at it again." Pl. Dep. 85. Dent brushed it off and said that's "Albert being Albert." Pl. Dep. 85.  LaQuesha Waring, a Sales Associate at the Andrews store, overheard Boyd make several remarks to Plaintiff.  Waring Aff. ¶ 4 (Ex. 5 to Pl. Response).  Waring did not suggest that Plaintiff tell anyone nor did she tell anyone about the comments because she was afraid they would lose their jobs.  Id. ¶ 5.  As time went on, the comments from Boyd became more frequent and the statements more direct.  Pl. Aff. ¶ 6. Except as described above, Plaintiff did not speak with anyone else in Dollar General management nor did she contact the ERC or ADR about any sexual comments by Boyd until after her termination. Pl. Dep. 87.

### C.    Plaintiff's Interactions with Boyd While She Was Acting as SM

As stated above, after Dent's employment ended, Plaintiff assumed some of the duties of SM and Bellamy instructed Boyd to assist her if she had any questions.  Plaintiff asked to be considered for the SM position permanently. Pl. Dep. 34.  While Boyd was assisting Plaintiff with her additional SM responsibilities at the Andrews store, Boyd made further comments.  "He would come in frequently from time to time, you know, saying little things, passing through the aisles, like you ain't ready to give me that thing yet, or I bet that thing good, meaning in a sexual way." Pl. Dep. 91.  "Then he started saying, if you give me some I can help you get the manager position."  Id.  He told her he had influence with the company and gave her an example of one of his former ASMs who later became a SM.  Pl. Aff. ¶ 8. Plaintiff testified that she just looked at him and brushed him off. Pl. Dep. 92.

On another occasion,

> [Boyd] called the store one night because he said he was just checking on us. Prior to that, you know, [Bellamy] had told me to contact him if I needed anything, that he would be in touch from time to time to check and make sure things were running smoothly. It was hard to work with him coming in and out like that because it was just–I just knew he was going to say something and he always did. So when he called this particular evening, he just said, he asked how everything was going. He proceeded to say, you're not ready to give me that thing yet and all I want to do is stick my finger in your P-U-S, yeah, and smell it, walk around and smell it all day.

Pl. Dep. 93, 96. Plaintiff called Michelle Lee, a Sales Associate in the Andrews store, over to listen to what Boyd was saying. Pl. Dep. 94-96; Pl. Aff. ¶ 8; Lee Dep. 31 (Ex. 3 to Pl. Response); Lee Aff. and Statements (Ex. 4 to Pl. Response). Although Plaintiff does not recall the exact date of this call, it occurred before Boyd became her manager or supervisor. Pl. Dep. 96.

In response to the question, "Why did you never just outright tell him to stop or go away?", Plaintiff testified,

> Everybody said they know–every–when I went to [Dent] and I said it to her and she brushed it off and she said that's just Albert being Albert. That's my manager. If I'm mentioning that to her and she said what she said, then if I mentioned it to my district manager and my district manager said what she said, then that–I felt by myself.

Pl. Dep. 95. During the telephone call, however, Plaintiff did tell Boyd that she was not going to have sex with him and hung up the telephone. Pl. Dep. 96. From that point forward, Boyd did not say anything to her that she considered sexual in nature. Pl. Dep. 97. After that phone conversation, Boyd still came by the Andrews store, but not as frequently, and said very little to Plaintiff. Pl. Dep. 101. However, he exhibited a bad attitude towards Plaintiff and assigned her tedious work. Pl. Aff. ¶ 8, Pl. Dep. 101. Boyd had no supervisory authority over Plaintiff at this time because he was still the Kingstree SM. Bellamy Dep. 25.

### D.    Boyd's Transfer to the Andrews Store as SM and Discovery of Plaintiff's Inaccurate Time Records

After Dent's employment ended, Boyd avers that he requested a transfer to the Andrews Store

because he had lived in Andrews his whole life and that store was closer to his home. Boyd Dec. ¶ 3; Pl. Dep. 41; Bellamy Dep. 25. Additionally, the store was in very bad shape and needed to be turned around. Bellamy Dep. 18. Boyd was chosen as the SM for the Andrews Store and transferred there from the Kingstree store on March 13, 2010. Boyd Dec. ¶¶ 3, 5. Shortly before that, Bellamy had asked Boyd to start keeping tabs on the Andrews Store's payroll because the store had been using too much. Boyd Dec. ¶¶ 3,5; Darrigo Dep. 32. When Boyd transferred to the Andrews store as SM, Plaintiff resumed her ASM position. Pl. Dep. 41, 101.

Lead Sales Associate, Corie Darrigo, wrote a statement dated March 30, 2010, stating Boyd called him on March 6, 2010, and asked him to check the payroll hours. Darrigo Dep. Ex. 1. Darrigo also testified that Boyd told him he was requesting the information on behalf of Bellamy.   Darrigo Dep. 32; see also Boyd Dec. ¶ 5. According to Darrigo, Boyd wanted to know about the store's payroll, specifically the store's hours and overtime.  Darrigo Dep. 31-33; see also Boyd Dec. ¶ 5. In reporting the week's payroll Darrigo noticed that Plaintiff had reported 54 hours that week. Darrigo Dep. 32.

Boyd asked why Plaintiff had 54 hours and Darrigo discovered that Plaintiff had recorded time for herself on a day during which she had not worked.  Boyd Dec. ¶ 5; Darrigo Dep. 32. Darrigo knew this because she had worked on the day Plaintiff claimed she was working and knew Plaintiff had not worked at all that day. Boyd Dec. ¶ 5; Darrigo Dep. 33; Darrigo Dep. Ex. 1. When Darrigo told Boyd about Plaintiff's time record, Boyd assumed Plaintiff's entry was a mistake, told Darrigo to correct it and to mention it to Plaintiff.  Boyd Dec. ¶ 5; Darrigo Dep. 33. Boyd did not further address the matter at that time and sought no disciplinary action against Plaintiff. Boyd Dec. ¶ 5.

The following week, Darrigo was reviewing the store week ending payroll again and looking at the overtime worked. Darrigo Dep. 54. Darrigo noticed that Plaintiff had again reported hours for

-7-

which she did not work. Boyd Dec. ¶ 6; Darrigo Dep. 33. Plaintiff had recorded herself as working from 6:00 a.m. to 9:30 p.m. one day that week. However, Darrigo worked from 2:00 p.m. to 9:30 p.m. that day and told Boyd that Plaintiff left at 2:30 p.m. not 9:30 p.m., as she had recorded. Boyd Dec. ¶ 6; Darrigo Dep. 33. Since this was the second such incident in a two-week period, and given Bellamy's running concerns over the store's payroll, Boyd reported it to Bellamy. Boyd Dec. ¶ 6. Bellamy told Boyd he would investigate the matter. Boyd Dec. ¶ 6.

### E.    The Decision to Terminate Plaintiff

Bellamy partnered with human resources to investigate the issue of Plaintiff reporting time that she had not worked. Bellamy Dep. 47. As part of the investigation, Bellamy personally verified via the Andrews store closed circuit television recordings that Darrigo was correct - Plaintiff had not worked during those times that Darrigo reported. Bellamy Dep. 43-44. Dollar General further reviewed Plaintiff's time records and audit trails that showed Plaintiff's personal log-in numbers being used to record her time in the system. Bellamy Dep. 39-40, 43-44. Dollar General was satisfied that Plaintiff had falsified her time records and that termination under its policies was appropriate. Bellamy Dep. 38, 47. Boyd avers that Bellamy did not seek input from him about the termination and he offered none. Boyd Aff. ¶ 8.

The morning of  March 25, 2010, Boyd told Waring something like "she [Plaintiff] was laughing now but he [Boyd] had something for her later." Waring Aff. ¶¶ 2-4. She told Plaintiff what Boyd said when Plaintiff arrived at the Andrews store. Id. Boyd called Plaintiff into the Andrews store office and explained she was being terminated for falsifying time records. Pl. Dep. 69; Boyd Dec. ¶ 9. Plaintiff observed Boyd as being "cocky and smirking." Pl. Aff. ¶ 10. Plaintiff denied the conduct, but Boyd showed Plaintiff the records reflecting her being signed in for time she did not work. Pl. Dep. 69, 142. Boyd also brought in Darrigo to verify what she had witnessed in relation to

the issues with Plaintiff's time records.  P. Dep. Ex. 14. From that point forward, Plaintiff admitted

she did not work the time she reported, but maintained it was just a mistake, not an intentional

falsification of records. Pl. Dep. 69-70, 142; P. Dep. Exs. 14, 16; Bellamy Dep. 63; Darrigo 41, 57;

Boyd Dec. ¶ 9.

It was not uncommon for the SM and ASM at the Andrews store to manually enter time

through Dollar General "store net" which allowed for time to be entered in advance rather than at clock

in and clock out.  Bellamy Dep. 59, 62; Pl. Dep. 42-46.  Plaintiff explained that prior to the day in

question, Plaintiff had planned to work a double-shift on that day and entered her time via "store net"

accordingly.  Pl. Aff. ¶ 12.  Boyd then became SM and told Plaintiff not to work the double shift and

that someone else would work it.  Id.  However, neither he nor Plaintiff changed the time reflecting

the double-shift that had already been entered in "store net." Id.  Plaintiff asserts that it was Boyd's

responsibility to review the time entered and change it if it was not correct.  Pl. Aff. ¶ 11.  Plaintiff's

pay varied during this time due to the abnormal shifts she was working and her checks were directly

deposited into her account, so she did not notice that her pay was more than it should have been.  Pl.

Aff. ¶ 13.

### F.     Plaintiff Report of Boyd's Sexual Comments and Boyd's Termination

When Boyd terminated Plaintiff he claims that Plaintiff reacted by telling him "I don't care

what I have to do, but I will get you."  Boyd Dec. ¶ 9.  Plaintiff asserts that she contacted Bellamy to

tell him that she should not have been fired.  Pl. Aff. ¶ 14.  She further asserts that Bellamy told her

the decision was made by Boyd, not  him, and that she should contact Human Resources.  Pl. Dep. 88;

Pl. Aff. ¶ 13.  Bellamy does not remember Plaintiff calling him and denies ever telling her that Boyd

made the decision to terminate her employment or that she should call Human Resources.  Bellamy

Dep. 46-49.

Plaintiff contacted Dollar General's Alternative Dispute Resolution department to contest her termination and complain that Boyd had sexually harassed her before becoming the SM at the Andrews Store. Pl. Dep. 87-88, 14-20. Notably, even before Boyd had arrived as the SM in Andrews, Plaintiff had told Darrigo that she was going to have him terminated for sexual harassment. Darrigo Dep. 39.

Dollar General investigated Plaintiff's claims of sexual harassment and had Bellamy gather witness statements from a number of Andrews Store employees. Bellamy Dep. 50-53. Boyd denied (and continues to deny) Plaintiff's allegations. Bellamy Dep. 52; Boyd Decl. ¶¶ 11, 12. However, in support Plaintiff's claim, one other employee, Michelle Lee, provided a written statement indicating that she heard sexual comments by Boyd toward Plaintiff during the phone call when Plaintiff told Boyd she was not going to sleep with him. Bellamy Dep. 52-53. Based on the information gathered, Dollar General terminated Boyd for inappropriate conduct on May 22, 2010. Bellamy Dep. 53-54; Boyd Dec. ¶ 10.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

IV.     DISCUSSION

A.      Whether Boyd Qualifies as a "Supervisor"

Under Title VII, an employer's liability for workplace harassment depends upon the status of the harasser. See Vance v. Ball State University, - - - U.S. - - - , 2013 WL 3155228, *1 (June 24, 2013). The Supreme Court has held that an employer is directly liable for the harassment of a co-worker if the employer was negligent with respect to the offensive behavior. Faragher v. Boca Raton, 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). However, the Court also held that an employer is vicariously liable for the harassment of a supervisor even without any negligence on the

-11-

part of the employer.  Id. at 807; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct.

2257, 141 L.Ed.2d 633 (1998).  Recently, in Vance v. Ball State University, the Supreme Court

recognized that Ellerth and Faragher left open the issue of who qualifies as a supervisor for vicarious

liability purposes under Title VII.  Vance, 2013 WL 3155228, * 3. The Court in Vance addressed the

split in circuit authority as to whether supervisor status requires "the power to hire, fire, demote,

promote, transfer, or discipline the victim" or whether such status is tied to "the ability to exercise

significant direction over another's daily work."  Id. at *7 (citations omitted).  The Vance Court held

that

> an employer may be vicariously liable for an employee's unlawful harassment only
> when the employer has empowered that employee to take tangible employment actions
> against the victim, i.e., to effect a "significant change in employment status, such as
> hiring, firing, failing to promote, reassignment with significantly different
> responsibilities, or a decision causing a significant change in benefits."

Id. (citations omitted). The Court rejected the opposing "nebulous definition" of supervisor, which

would provide supervisory status to employees who "have the ability to direct a co-worker's labor to

some ill-defined degree," as adopted by several courts of appeal, including the Fourth Circuit in

Whitten v. Fred's, Inc., 601 F.3d 231, 245–247 (C.A.4 2010).[5]  Id.

The undisputed facts in the record reveal that Plaintiff worked as an ASM in the Andrews

store.  Plaintiff worked under the supervision of SM Dent until February of 2010, when Dent's

employment ended.  In mid-to-late 2009, Dollar General was opening a new store in Kingstree, South

Carolina, where Boyd was the SM.  For one to two weeks during that time, Plaintiff worked at the

_____

[5]The facts in Whitten are similar to those here with respect to the positions held by the
harasser and the victim.  In Whitten, the plaintiff was an assistant store manager at a retail store and
the harasser was the store manager.  Whitten, 601 F.3d at 236.  The store manager had no authority
to fire, promote, demote or otherwise make decisions that had an economic effect on the plaintiff.
Id. at 244.  The Fourth Circuit vacated the decision of the District Court, which held that the
harasser was not the plaintiff's supervisor because he lacked the authority to make tangible
employment decisions.  Id.

Kingstree store to assist with its opening. Dent remained her SM until Dent's termination in February of 2010. Boyd became the SM at the Andrews store on March 13, 2010. Between the time Dent was terminated and Boyd was transferred to the SM position at the Andrews store, Plaintiff was the acting SM. Plaintiff was terminated on March 25, 2010.

Boyd began making sexual comments to Plaintiff when she helped in the Kingstree store in mid-to-late 2009 and continued making such comments until she told him in no uncertain terms that she would not have sex with him during a telephone call that occurred sometime while Plaintiff was still acting SM of the Andrews store (i.e., sometime between February of 2010 and March 13, 2010).

It is undisputed that the sexual harassment by Boyd occurred prior to him becoming her SM. Plaintiff does not argue that Boyd had any authority to terminate her employment, demote her or promote her during this time. Thus, Boyd was not Plaintiff's supervisor at the time the harassment occurred.[6] Thus, Defendant will be liable for any alleged harassment only if it was negligent with respect to the offensive behavior. In other words, because Boyd was not Plaintiff's supervisor, Dollar General cannot be vicariously liable for Boyd's actions.

**B.    Two Types of Sexual Harassment Causes of Action**

Title VII makes it "an unlawful employment practice for an employer . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment represents one form of this prohibited sex discrimination. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Courts recognize two categories of sexual harassment: (1) quid pro quo harassment, where sexual

---

[6]Whether Boyd was Plaintiff's supervisor after he became her store manager for Title VII liability purposes as defined by the Supreme Court is not as clear, as discussed in more detail below.

-13-

consideration is demanded in exchange for job benefits; and (2) harassment that creates an offensive or hostile work environment. See Katz v. Dole, 709 F.2d 251, 254 (4th Cir.1983); Rachel-Smith v. FTData, Inc., 247 F.Supp.2d 734, 745 (D.Md.2003).  Plaintiff raises both a quid pro quo claim and a hostile work environment claim.

### 1.     Quid Pro Quo

#### a.     Pretext Analysis

Quid pro quo liability exists where "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The familiar proof scheme developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is applicable in quid pro quo claims.  See, e.g., Okoli v. City of Baltimore, 648 F.3d 216 (4th Cir. 2011) (applying the burden-shifting analysis to a quid pro quo claim).[7]  To establish a prima facie case of quid pro quo sexual harassment under Title VII, a plaintiff must satisfy five elements: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; that is, the acceptance or rejection of the harassment must be an express or implied condition to the receipt of

---

[7]Plaintiff argues she has direct evidence of quid pro quo sexual harassment because she and Lee both testify that Boyd told her that he would he assist her in becoming store manager if she would have sex with him.  However, as discussed below, Plaintiff alleges that she was terminated as a result of her refusal of Boyd's sexual advances.  Direct evidence requires "evidence of conduct or statements that both reflect directly the allegedly discriminatory attitude and that bear directly on the contested employment decision." Kubicko v. Ogden Logistics Services, 181 F.3d 544, 553 (4th Cir. 1999).  Plaintiff presents no evidence that Boyd told her he would fire her or have her fired if she did not succumb to his advances.  Thus, Plaintiff fails to present direct evidence that she was fired because of her response to Boyd's sexual requests.

a job benefit or cause of a tangible job detriment; and (5) the employer either knew or should have known of the harassment and took no effective remedial action.  Okoli v. City of Baltimore, 648 F.3d 216, 222 (4th Cir.2011) (citing Brown v. Perry, 184 F.3d 388, 393 (4th Cir.1999)).  With respect to the fourth element, a plaintiff must show that she was deprived of a job benefit that she was otherwise qualified to receive.  Id.  "The fifth element is 'automatically met' when the harassment was alleged to have been perpetrated by a supervisor.  Id. (citing Spencer v. General Elec. Co., 894 F.2d 651, 658 n. 10 (4th Cir.1990)). Defendant argues that Plaintiff fails to present sufficient evidence to establish the fourth or fifth elements.

In her Response, Plaintiff argues that two tangible employment actions occurred as a result of her refusal of Boyd's sexual advances:  she was not promoted to the SM position at the Andrews store and her employment was terminated.  However, Plaintiff does not raise a failure to promote claim in her Amended Complaint.  There, she alleges that "subsequent to Plaintiff denying sexual favors to the Manager, Boyd terminated Plaintiff for allegedly placing improper time on the computer. . . . Plaintiff termination was taken because of and was a direct result of her sex and her failure to provide sexual favors to her manager which is illegal under Title VII."  Amended Complaint ¶¶ 12-13.  She further alleges that "Plaintiff was terminated without just cause and contrary to policies and procedures of the Defendant, upon information and belief, in whole or in causative part because she was a woman and she did not engage in sexual activity with her male manager." Amended Complaint ¶ 19.  Plaintiff does not allege that she was denied a promotion as a result of her failure to oblige Boyd's sexual requests.  Thus, the only tangible employment action properly before the court is Plaintiff's termination.

To satisfy the fourth element of her quid pro quo claim, Plaintiff must present evidence sufficient to show that her reaction to the harassment affected her termination.  Brown, 184 F.3d at

-15-

393. In other words, Plaintiff must establish, through direct or circumstantial evidence, a nexus or causal connection between her rejection of the unwelcome sexual advances and her termination. See Lewis v. Forest Pharm., Inc., 217 F.Supp.2d 638, 648 (D.Md.2002) (explaining that the plaintiff "must also show a causal connection between her rejection of [the] sexual overtures and the various employment actions she has suffered"). "Courts have long-recognized the difficulty of determining whether the requisite causal connection is present in cases where the acceptance of harassment was purportedly an implied condition, rather than an explicit condition, of receiving a job benefit or avoiding a job detriment." Briggs v. Waters, 484 F.Supp.2d 466, 479 (E.D.Va. 2007). "'[A] plaintiff may rely upon a broad array of evidence' to establish the requisite causal link, and a court can consider circumstantial evidence and draw inferences in favor of the plaintiff in determining whether the causal link has been established." Id. (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283–84 (3d Cir.2000)). The Briggs court recognized that "one way to establish the requisite nexus is to show that 'the unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision.'" Id. at 479-80 (citing Lewis, 217 F.Supp.2d at 648-49). Here, Plaintiff's termination occurred on March 25, 2010. Although it is not entirely clear when Plaintiff specifically voiced her rejection to Boyd of his sexual advances, the evidence reveals that it was sometime after Dent left her employment at the Andrews store in February of 2010 but before Boyd became the SM at the Andrews store on March 13, 2010. Thus, no more than two months passed between the rejection and Plaintiff's termination.

Further, an issue of fact exists as to whether Boyd made or substantially influenced the decision to terminate Plaintiff's employment. Plaintiff testifies that, to her knowledge, Boyd made the decision to terminate her. Pl. Dep. 70. She further testifies that Bellamy told her that the decision

to terminate her was made by Boyd.  Pl. Dep. 88. Additionally, on the morning Plaintiff was terminated, Boyd told Waring something like "she [Plaintiff] was laughing now but he [Boyd] had something for her later."  Waring Aff. ¶¶ 2-4.    Bellamy, on the other hand, testifies that he did not tell Plaintiff that Boyd made the decision to terminate her.  Bellamy Dep. p. 47.  Bellamy testifies that he made the decision to terminate Plaintiff and Boyd "partnered" with him.  Id.  He explains that "[s]tore managers always have to partner with their DM to terminate any key holder in a building." Id.  Boyd avers that, after he reported the discrepancies in Plaintiff's time to Bellamy, Bellamy told him that an investigation had been done and the decision had been made to terminate Plaintiff.  Boyd Aff. ¶ 8.  Boyd avers that he was not asked to provide input as to whether Plaintiff would be terminated.  Id.  Emails between Bellamy and Gloria Avilia with Dollar General's Dispute Resolution Department also indicate that Boyd partnered with Bellamy on the termination decision. Emails Between Bellamy and Avilia (Ex. 10 to Pl. Response).  After Plaintiff contacted the dispute resolution department to contest her termination, Avilia contacted Bellamy, not Boyd, for the details of the termination.  Id.  Thus, conflicting evidence exists as to Boyd's involvement in Plaintiff's termination.

A question of fact also exists as to whether Dollar General either knew or should have known of the harassment and took no effective remedial action.  When Boyd first began making sexual comments towards Plaintiff when she helped to open the Kingstree store, Plaintiff did not report the comments to anyone, knowing that she would not be working there for very long.  However, when both Dent and Campbell asked Plaintiff if she was interested in working at the ASM in the Kingstree store, Plaintiff told Dent she would not work as Boyd's ASM because Boyd was "fresh" and "nasty." Pl. Dep. 81. To Campbell, Plaintiff responded that she would not work in the Kingstree store because she did not feel like being hit on every day. Pl. Dep. 87. Later, before Dent's employment ended, Plaintiff told Dent that Boyd was "at it again." Pl. Dep. 85-86.  She also avers that she told Dent that

Boyd had been propositioning her for sex and making very sexual statements to her although it is not clear when this conversation took place. Pl. Aff. ¶ 4.

"The law against harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006). Although sexual harassment complaints need not include "magic words" such as "sex" or "sexual" to be effective, the complaint must in some way allege unlawful discrimination. Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C.Cir.2006). Plaintiff's comments to managers Dent and Campbell about Boyd and her refusal to work permanently as Boyd's ASM with their concomitant inferences in Plaintiff's favor are sufficient to create an issue of fact as to whether she put her managers on notice of Boyd's harassment.

Additionally, even though Plaintiff did not report Boyd's conduct to the ERC or ADR departments, the relevant inquiry is whether the employee adequately alerted his employer to the harassment, not whether he followed the letter of the reporting procedures set out in the employer's harassment policy. See, e.g., Cerros v. Steel Technologies, Inc., 398 F.3d 944, 952-53 (7th Cir. 2005) (citing Crowley v. L.L. Bean, Inc., 303 F.3d 387, 403 (1st Cir.2002) (rejecting L.L. Bean's contention that the plaintiff "did not properly notify management of her complaints because she 'bypass[ed] the reporting requirements under L.L. Bean's harassment policies,'" given that she "repeatedly alerted team leaders and supervisors" to the misconduct (internal citation omitted)); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 876 & n. 10 (9th Cir.2001) (observing that, although the plaintiff's complaints to his managers "did not follow the formal reporting requirements of Azteca's anti-harassment policy, they were sufficient to place the company on notice of harassment")). Thus, Plaintiff's reports to Dent and Campbell are sufficient to create an issue of fact as to whether Dollar

General was on notice of Boyd's harassment.  Therefore, Plaintiff presents sufficient evidence to establish a prima facie showing of quid pro quo sexual harassment.

Accordingly, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. McDonnell Douglas, 411 U.S. 792 at 802; Baqir v. Principi, 434 F.3d 733, 747 (4th Cir.2006).  Here, Dollar General asserts that Plaintiff was terminated for falsifying her time records on two separate occasions.  Thus, the burden returns to Plaintiff to establish that the employer's proffered reason is a pretext for discrimination. Baqir, 434 F.3d at 747.

Plaintiff does not deny that she was paid for time she did not work based upon entries she made regarding her time.  However, she argues that it was simply a mistake on her part because she had originally planned to work a double-shift and entered her time accordingly but ended up not working the double-shift.  She argues that it was Boyd's responsibility as SM to catch the mistake and remedy it.  However, this argument is not consistent with the record.  See Bellamy Dep. 30-37 (explaining that an employee is paid by the time he or she clocks in and out and it is not necessary for a store manager to change anything with respect to time as long as employees clock in and out appropriately); Plaintiff Dep. 49-58.  Furthermore, Plaintiff admits to the actions that lead to her termination and acknowledged that falsifying time records is specifically prohibited by Dollar General's Employee Handbook and can subject an employee to immediate termination of employment. Plaintiff understood that keeping accurate time records was important to Dollar General.  Thus, Plaintiff fails to show that the reason given for her termination, falsification of records, was not the true reason but simply pretext. Accordingly, summary judgment is appropriate on Plaintiff's quid pro quo claim under the McDonnell Douglas pretext analysis.

### b.    Mixed Motive Analysis

Plaintiff also argues that a mixed-motive analysis is appropriate here.  That is, she argues

that, even if her termination was based in part upon her conduct, it was also based in part upon her failure to comply with Boyd's sexual advances. "Under the 'mixed-motive' framework, a plaintiff must offer sufficient evidence of discrimination so that a reasonable jury could conclude that discrimination was a motivating factor for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir.2004). The Fourth Circuit has emphasized that "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" Hill, 354 F.3d at 286 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The Hill court further stated,

> To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that "the protected trait ... actually motivated the employer's decision." Reeves, 530 U.S. at 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (internal quotation marks omitted). The protected trait "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." Id. (internal quotation marks and alterations omitted); cf. Price Waterhouse [v. Hopkins], 490 U.S. [228,] 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (O'Connor, J., concurring) (noting that "statements by nondecision makers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination); Koski v. Standex Int'l Corp., 307 F.3d 672, 678 (7th Cir.2002) (noting that the pertinent inquiry is whether the decision maker, as opposed to other managers or subordinates, evaluated the aggrieved employee based upon discriminatory criteria).

Id.

Here, as discussed above, an issue of fact exists as to whether the decision to terminate Plaintiff's employment was made by Boyd, the harasser. Thus, given the close proximity in time between Plaintiff's rejection of Boyd's advances and her termination and the question as fact to the

extent of Boyd's involvement in her termination, summary judgment is not appropriate on Plaintiff's quid pro quo claim under a mixed-motive analysis.

### 2.     Hostile Work Environment

Plaintiff also asserts a sexually hostile work environment claim.  Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a)(1). To survive a motion for summary judgment on her claim of sexually hostile work environment in violation of Title VII, Plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct was 1) unwelcome, 2) based upon her sex, 3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and 4) imputable to her employer. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir.2003).  Defendant argues that Plaintiff cannot prove the third and fourth elements.

To show that the unwelcome conduct was sufficiently severe and pervasive, Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard."

EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008).

Plaintiff has presented evidence that, beginning in mid-to-late 2009 through early March of 2010 at the latest, Boyd frequently made sexual comments to her, including using vulgar language to refer to her body and describing in detail the sexual acts he would like to do with or to her. The evidence presented is sufficient to create an issue of fact as to whether Boyd's conduct was sufficiently severe and pervasive to alter the terms and conditions of her employment. See, e.g., Baskerville v. Culligan Intern. Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (internal citations omitted) ("Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers."); Beardsley v. Webb, 30 F.3d 524, 528–29 (4th Cir.1994)(finding a hostile work environment when, over six months, a supervisor massaged an employee's shoulders, stated he wanted to "make out" and "have his way" with her, falsely accused her of having an affair, and asked her about her underwear, birth control, and the bodily effects of taking maternity leave); Mandsager v. Univ. of N.C., 269 F.Supp.2d 662, 673 (M.D.N.C.2003) (finding that allegations that professor often put his arm around plaintiff, signed correspondence "Love, William," and sexually propositioned her were sufficient to allege severe and pervasive harassment for purposes of a motion to dismiss).

Further, as discussed above with respect to Plaintiff's quid pro quo claim, an issue of fact exists as to whether Boyd's conduct is imputable to Dollar General. Plaintiff reported Boyd's conduct to her managers and no action was taken against Boyd until after Plaintiff's termination when she again reported his conduct. As such, an issue of fact exists as to Plaintiff's hostile work

-22-

environment claim and summary judgment is not appropriate.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary

Judgment (Document # 31) be denied as to Plaintiff's quid pro quo mixed motive claim and her

hostile work environment claim and that it be granted on all other causes of action.[8]


 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 16, 2013
Florence, South Carolina

---

[8]As stated in footnote 1, Plaintiff also raised claims of gender discrimination, retaliation and breach of contract in her Amended Complaint.  However, she fails to address Defendant's arguments for summary judgment on these claims in her Response.  Thus, it appears that she had abandoned these claims.  See Eady v. Veolia Transp. Services, Inc., 609 F.Supp.2d 540, 560–561 (D.S.C.2009) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."); accord, Ferdinand–Davenport v. Children's Guild, 742 F.Supp.2d 772, 777 (D.Md.2010); Jones v. Family Health Ctr., Inc., 323 F.Supp.2d 681, 690 (D.S.C.2003); Mentch v. Eastern Savings Bank, FSB, 949 F.Supp. 1236, 1247 (D.Md.1997).